**Opinion issued March 26, 2020.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00409-CV

———————————

**NEWPARK MATS & INTEGRATED SERVICES, LLC AND NEWPARK RESOURCES, INC., Appellants**

**V.**

**CAHOON ENTERPRISES, LLC; AUSTIN L. CAHOON; AND MARK CAHOON, Appellees**

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-90276**

---

## O P I N I O N

Cahoon Enterprises, LLC, Austin L. Cahoon, and Mark Cahoon (collectively, Cahoon) sued Newpark Mats & Integrated Services, LLC and Newpark Resources, Inc. (collectively, Newpark) for trade secret misappropriation, violations of the

Texas Theft Liability Act (TTLA),[1] breach of contract, tortious interference with an existing contract, tortious interference with prospective business relations, and intentional infliction of emotional distress. Newpark filed a motion to dismiss all of Cahoon's claims pursuant to the pursuant to the Texas Citizens' Participation Act (TCPA).[2] The trial court denied the motion with respect to these causes of action. On appeal, Newpark argues that the trial court erred by denying its motion to dismiss Cahoon's lawsuit in its entirety because Newpark demonstrated that the TCPA applied to all of Cahoon's claims, Cahoon did not prove that one of the TCPA's exemptions applies, Cahoon did not make a prima facie case by clear and specific evidence, and, even if Cahoon made its prima facie case, the trial court should have nevertheless dismissed the lawsuit because Newpark established, by a preponderance of the evidence, each essential element of its affirmative defense of release. We affirm the trial court's judgment.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE §§ 134.002, .003(a).

[2] *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001–27.011. The Texas Legislature amended certain provisions of the TCPA in 2019. Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–9, § 12, sec. 27.001, 27.003, 27.005–.007, 27.0075, 27.009–.010 (to be codified at TEX. CIV. PRAC. & REM. CODE §§ 27.001, 27.003, 27.005–.007, 27.0075, 27.009–.010). The amendments became effective September 1, 2019. *Id.* at § 11. Because suit was filed before the effective date of the amendments, this case is governed by the statute as it existed before the amendments. *See id.* All our citations and analyses are to the TCPA as it existed prior to September 1, 2019, unless otherwise noted.

**Background**

Cahoon Enterprises is a small family-owned business in North Dakota that provides various trucking, roustabout, and excavation services for the fracking oil drilling and production activities in Bakken Formation. The company's founder, Mark Cahoon, and his son, Austin Cahoon, oversee the company's operations. The roustabout services provided by Cahoon Enterprises include, among other things, mat installation and removal services for the mats that are installed under the sand boxes that are hauled into oil fields at fracking sites. Newpark manufactures the type of heavy duty composite matting systems that Cahoon Enterprises installs.

In May 2017, Newpark hired Cahoon Enterprises as an independent contractor "to coordinate orders for the rental and installations of [Newport's] mats for customers." The terms of their agreement were memorialized in the Master Service Agreement executed by the parties. Because Newpark did not have any employees located in the Bakken Formation at that time, Newpark "relied on Cahoon Enterprises to essentially manage [Newpark's] mat rental and installation unit in the Bakken Formation."

In October 2017, Newpark acquired Well Service Group, Inc. (WSG), a business that provides similar mat-related services to those provided by Cahoon Enterprises. WSG, which was located in Pennsylvania, did not do business in the Bakken Formation region of North Dakota at that time.

In May 2018, one of Cahoon Enterprises' managers, Jose Reyes, resigned to form a competing business. According to Cahoon, Reyes contacted Newpark after he left Cahoon Enterprises "to try to get Newpark's business from Cahoon Enterprises and to disparage or otherwise sabotage Cahoon Enterprises in doing so."

On June 27, 2018, Ken Higley, "a supervisor with WSG in Pennsylvania (now Newmark)," and another Newpark employee, Robert, visited Cahoon Enterprises' office in North Dakota "for the stated purpose of taking an inventory of Newpark's mats in Cahoon Enterprises' yard and to audit some of Cahoon Enterprises' invoices to Newpark." The next day, Higley and Robert "showed up to Cahoon Enterprises' office and told the staff that they needed to list[en up] and that things could be done the hard way or the easy way. Higley continued and said there were sheriffs and FBI agents outside of Cahoon Enterprises' office and [he] was either going to take [Cahoon Enterprises'] business records, or law enforcement officers would come in to arrest the staff and seize the paperwork."

Higley and Robert collected at least two boxes of Cahoon Enterprises' original business records, many of which were unrelated to the work Cahoon Enterprises had done for Newpark, including records for work that Cahoon Enterprises had done for other customers and Cahoon Enterprises' employee personnel files. According to Higley, Newpark had a "team" of auditors at a nearby location "combing through" the records. Cahoon further contends that as a result of Newpark taking these original

4

records and not returning them for several weeks, Cahoon Enterprises was not able to bill its other customers for work performed during this period.

While Newpark was reviewing Cahoon Enterprises' records, Higley "repeatedly told Austin Cahoon that both he and his father, Mark Cahoon, were being investigated by the FBI for fraud against Newpark, and that 'if you play your cards right' [Cahoon] would avoid criminal prosecution." Higley also met with Cahoon Enterprises' staff during this same period. During one of those meetings, Higley "stated (in an audio recording made by one of Cahoon Enterprises' employees) that he was running the show now; that everything was to go through him now; and that Mark and Austin Cahoon were both being investigated for fraud and would no longer be in charge of the matting operations." Higley then began scheduling jobs using Cahoon Enterprises' employees and equipment and visiting job sites, even though he did not have the required safety certifications and training. Newpark also began hiring some of Cahoon Enterprises' competitors to install and remove its mats from work sites in North Dakota.

At some point during this period, Newpark employees came to Cahoon Enterprises' offices to compare Newpark's billing records with Cahoon Enterprises' records "to determine if Newpark had billed its clients correctly and to determine how screwed up their internal records were for the region." After Newpark's personnel had spent hours "going through the paperwork with [Cahoon Enterprises']

secretarial staff, Higley stated, 'If our [Newpark's] billing office has billed what this [referencing a billing spreadsheet] states we billed, we [Newpark] are fucked.'"

Austin Cahoon alleges that, at some point, Higley had told him that "Newpark was guilty of over-billing Halliburton and Liberty Frac and that Newpark's plan was to use Cahoon Enterprises as a scapegoat to whom Newpark could blame the over-billing and thereby conceal its breaches of its contracts with these customers." Higley also told him and others that "while he had initially thought that Cahoon Enterprises may actually be to blame for some of the client over-billing, he had come to realize that the blame rested with Newpark's billing office in Grand Junction, which had overbilled customers way outside of their contracts." Higley also "admitted (including in an audio recording) that it was wrong of Newpark to try to withhold monies owed to Cahoon Enterprises to cover damages to its mats that had been caused by the renters/customers, not Cahoon."

Some of Cahoon Enterprises' office staff quit during this time and Austin Cahoon had to promise them pay raises to convince them to return to work. According to Austin Cahoon, Higley helped him convince these staff members to return "because [Higley] knew that Cahoon Enterprises needed them working for us at least until some key projects were completed before Higley and Newpark had their competing business venture established."

6

Cahoon alleges that Newpark terminated the MSA soon after it collected Cahoon Enterprises' business records and took over management of the company's business operations. Newpark then immediately began "directly operating a competing mat services business for oil drilling activity in the Bakken Formation" through a company co-owned by Higley which provides the same oilfield roustabout services as Cahoon Enterprises. Newpark also hired several of Cahoon Enterprises' employees for the new business.

Cahoon subsequently sued Newpark for trade secret misappropriation, violations of the TTLA, defamation, breach of contract, tortious interference with an existing contract, tortious interference with prospective business relations, and intentional infliction of emotional distress. In its petition, Cahoon alleged that Newpark misappropriated its trade secrets in violation of TUTSA.[3] Specifically, Cahoon alleged that Newpark accessed "Cahoon Enterprises' customer data — including detailed field tickets, invoices, [and] customer bids/quotes," and that this confidential and proprietary information was "accessed, stolen and copied with the intent to use and disclose this information to others within Newpark to create a competing business, and [that Newpark] did, in fact, use it to create a competing business providing mat services to drilling operations in the Bakken Formation." According to Cahoon, Newpark "misappropriated Cahoon Enterprises' trade secrets

---

[3]     *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.001–.008.

7

with the intent to benefit from the use or disclosure of such information in order to gain an unfair competitive advantage in the industry. Defendants have used Cahoon Enterprises' trade secrets to undercut Cahoon Enterprises with customers, use Cahoon Enterprises' processes and methods to provide products and services, and save themselves the time, effort, and expense it would have cost them to develop these methods, processes, products, and services on their own."

Cahoon further alleged that Newpark violated the TTLA, by "unlawfully appropriat[ing Cahoon Enterprises'] confidential and proprietary information and trade secrets without Cahoon Enterprises' consent, and with the intent to deprive or take control of this personal property of Cahoon Enterprises."

Cahoon also alleged that Newpark defamed Cahoon Enterprises, Austin Cahoon, and Mark Cahoon, "by publishing false, defamatory statements against them, including, without limitation, accusations that they were unethical and under criminal investigation by the FBI."

Cahoon alleged that Newpark violated the MSA by, among other things, "grossly overreaching their inspection and audit rights by outright taking Cahoon Enterprises' business records, and failing to pay Cahoon Enterprises for all invoices and services rendered." According to Cahoon, Newpark owes Cahoon Enterprises over $900,000 in unpaid invoices.

With regard to its claim for tortious interference with an existing contract, Cahoon alleged that "Cahoon Enterprises had valid contracts with clients at the time [Newpark] stole its business records, defamed [Cahoon], and then started their competing venture." According to Cahoon, Newpark "willfully and intentionally interfered with these contracts, including through misappropriation, reliance and use of Cahoon Enterprises' trade secrets and other confidential and proprietary data; through their defamation of Plaintiffs; and through their breach of [Newpark's] contractual duties owed to Cahoon Enterprises." Cahoon made similar allegations with respect to its tortious interference with prospective business relations. Specifically, Cahoon alleged that it "had prospective business relations with existing and potential clients and others at the time [Newpark] stole Cahoon Enterprises' business records, defamed [Cahoon], and then started their competing venture." Cahoon further contends that Newpark "willfully and intentionally interfered with these relationships, including through misappropriation, reliance and use of Cahoon Enterprises' trade secrets and other confidential and proprietary data; through its defamation of Plaintiffs; and through its breach of Defendants' contractual duties owed to Cahoon Enterprises." Mark Cahoon and Austin Cahoon also asserted claims against Newpark for intentional infliction of emotional distress (IIED), which they later averred were based on the severe emotional distress they suffered as a result of Newpark's "destruction" of their family business.

9

Newpark answered and asserted an affirmative defense of release and a counterclaim for declaratory judgment. Specifically, Newpark alleged that it entered into a settlement agreement with Universal Funding Corporation, a factoring company to whom Cahoon Enterprises had assigned all its accounts receivable and conferred an irrevocable power of attorney to, among other things, settle claims on Cahoon Enterprises' behalf with respect to these accounts. Under the terms of its agreement with Universal, Newpark agreed to pay Cahoon Enterprises $912,158.08 "in full and final settlement of any and all claims by Cahoon Enterprises and/or [Universal]" and further agreed to "make this payment to [Universal] pursuant to the Notification Agreement[,] which provides that 'payments on any and all invoices that have not been paid and any in the future be made payable to [Universal] . . .'" Pursuant to the agreement, Universal, for itself and on behalf of Cahoon Enterprises, executed a general release that Newpark contends released all of Cahoon's claims in the current lawsuit.

Newpark filed a motion to dismiss Cahoon's claims pursuant to the TCPA. Cahoon responded and attached, among other things, affidavits from Austin Cahoon and Mark Cahoon. Newpark filed a motion to strike objectionable portions of Austin Cahoon's affidavit and exhibits attached to his affidavit. The court sustained most

of the objections.[4] The trial court also granted Newpark's motion in part and dismissed Cahoon's defamation claims, but denied the motion with respect to the other causes of action.[5] This interlocutory appeal followed.

**Motion to Dismiss Pursuant to the TCPA**

On appeal, Newpark argues that the trial court erred by denying its motion to dismiss Cahoon's lawsuit in its entirety because Newpark demonstrated that the TCPA applied to all of Cahoon's claims and Cahoon did not prove that one of the TCPA's exemptions applies, or make its prima facie case by clear and specific evidence. Newpark further contends that even if Cahoon made its prima facie case, the trial court should have nevertheless dismissed Cahoon's lawsuit because Newpark established, by a preponderance of the evidence, each essential element of its affirmative defense of release.

A. **TCPA Statutory Framework**

Chapter 27 of the Texas Civil Practice & Remedies Code, also known as the Texas Citizens Participation Act, "is a bulwark against retaliatory lawsuits meant to intimidate or silence citizens on matters of public concern." *Dall. Morning News,*

---

[4] Because the trial court sustained Newpark's objections, these statements are not part of the appellate record and we are not relying upon them for purposes of this appeal.

[5] The trial court's dismissals Cahoon Enterprises', Austin's, and Mark's defamation claims are not subject to interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12) (permitting interlocutory appeal of order that denies TCPA motion to dismiss).

11

*Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019); *see In re Lipsky*, 460 S.W.3d 579, 58 (Tex. 2015). The act "is intended to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d at 589.

The purpose of the TCPA, as stated in Civil Practice and Remedies Code chapter 27, "is to 'encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.'" *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam) (quoting TEX. CIV. PRAC. & REM. CODE § 27.002). The TCPA's primary vehicle for accomplishing its stated purpose is a three-step motion-to-dismiss procedure that allows a defendant who claims that a plaintiff has filed a suit in response to the defendant's exercise of a constitutionally protected right to seek dismissal of the underlying action, attorneys' fees, and sanctions at an early stage in the litigation. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.003(a), .009(a); *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 132 (Tex. 2019); *Gaskamp v. WSP USA, Inc.*, ___ S.W.3d ___, No. 01-18-00079-CV, 2020 WL 826729, at *7–8 (Tex. App.—Houston [1st Dist.] Feb. 20, 2020, no pet. h.) (en banc).

A defendant invoking the TCPA's protections by filing a motion to dismiss must show first by a preponderance of the evidence that the TCPA applies. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). The TCPA applies if the plaintiff's "legal action is based on, relates to, or is in response" to the defendant's exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association. *Id.*; *In re Lipsky*, 460 S.W.3d at 586–87. A "legal action" is "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." TEX. CIV. PRAC. & REM. CODE § 27.001(6).

If the defendant makes this initial showing, the burden shifts to the plaintiff to establish "by clear and specific evidence a prima facie case for each essential element" of his claim. TEX. CIV. PRAC. & REM. CODE § 27.005(c); *In re Lipsky*, 460 S.W.3d at 587. If, however, the plaintiff establishes a prima facie case for its claim, then the burden shifts back to the movant to establish, by a preponderance of the evidence, each essential element of a valid defense. TEX. CIV. PRAC. & REM. CODE § 27.005(d). A plaintiff can avoid the act's burden-shifting requirements, however, by showing that one of the TCPA's exemptions applies, such as the commercial speech exemption. *See id.* § 27.010(b).

If the trial court grants the motion to dismiss, it must award costs, reasonable attorneys' fees, and other expenses of defending against the action "as justice and

13

equity may require." *Id.* § 27.009(a). The trial court also must sanction the plaintiff in an amount "sufficient to deter the party who brought the legal action from bringing similar actions." *Id.*[6]

## B. Standard of Review

We review de novo the denial of a TCPA motion to dismiss. *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 353 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Whether the TCPA applies to Cahoon's claims is an issue of statutory interpretation that we also review de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018); *Gaskamp,* 2020 WL 826729, at *8.

In determining whether to grant or deny a motion to dismiss, the court must consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.[7] TEX. CIV. PRAC. & REM. CODE § 27.006(a). We view the pleadings and evidence in the light most favorable to the nonmovant. *Dolcefino*, 540 S.W.3d at 199; *see Schimmel v. McGregor*, 438 S.W.3d 847, 856-57 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

---

[6]     This portion of the TCPA was amended, effective September 1, 2019. Under the amended version of the TCPA, an award of sanctions is optional, not mandatory.

[7]     The record before us includes only the unstruck portions of the evidence.

14

## C. Applicability of the TCPA to Cahoon's Claims

Newpark argues that the TCPA applies to each of Cahoon's claims because each claim is "based on, relates to, or is in response to" Newpark's exercise of the right of association and the right of free speech. According to Newpark, all of Cahoon's complaints stem from Newpark's invocation of its contractual audit rights which "necessarily entailed Newpark engaging in oral and written 'communications' . . . that were made 'in connection with' Newpark's investigation of Cahoon's fraudulent overbilling."

### 1. Right of Association

In it motion to dismiss, Newpark argued that all of Cahoon's claims were based on Newpark's exercise of the right of free association under the TCPA. At the time the suit was filed, the TCPA defined the "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." TEX. CIV. PRAC. & REM. CODE § 27.001(2); *see Gaskamp*, 2020 WL 826729, at *8.

Here, Newpark asserts that there are two exercises of associational rights at issue in this case, namely, the joining together of "Newpark's managers, employees, and agents . . . as well as with managers, employees and agents of overbilled customers and whistleblowing managers, employees, and agents of Cahoon, itself" in a joint effort to express, promote, and pursue the common

15

interests of "investigating Cahoon's billing practices and rooting out any fraud" and "form[ing] a competing business."

Newpark relies on this court's original opinion in *Gaskamp* in support of its argument that "allegations that one conspired to misappropriate trade secrets and form a competing business implicated a cognizable associational right that triggers the TCPA's protections." While Newpark's appeal has been pending, however, an en banc panel of this court withdrew the original opinion in *Gaskamp* and issued a new opinion in which it reaches the opposite holding. *See Gaskamp*, 2020 WL 826729, at *1.

In *Gaskamp*, the plaintiff sued three former employees for tortious conduct related to their alleged misappropriation of the plaintiff's trade secrets and confidential information. Among other things, the plaintiff alleged that these employees had used and disclosed its trade secrets and proprietary confidential information in order to compete with the plaintiff for their own financial gain at a new company founded by another former employee which offered the same services provided by the plaintiff. *See id.* at *3. The plaintiff further alleged that the employees had used the misappropriated trade secrets to tortiously interfere with its existing contracts and prospective business relationships. *See id.* The employees filed a motion to dismiss pursuant to the TCPA in which they asserted, among other things, that the plaintiff's claims were based on, related to, or were in response to

their exercise of their right of association. *See id.* at *4. Specifically, the employees argued the lawsuit was based on, related to, or were in response their joining together to collectively express, promote, pursue, or defend a common interest—"their new business venture." *See id.* at *11.

The en banc court in *Gaskamp* held that "with respect to the pre-amendment version of the TCPA, the proper definition of 'common' in the phrase 'common interests' is 'of or relating to a community at large: public.'" *See id.* at *13. Relying upon this interpretation, this court determined that the employees did not meet their burden of showing, by a preponderance of the evidence, that the plaintiff's suit was based on, related to, or was in response to an exercise of their right of association because the conduct and communications at issue, which involved misappropriating plaintiff's trade secrets and conspiring to commit related torts, "benefitted only the five alleged tortfeasors" and there were no "allegations that the tortfeasors 'join[ed] together to collectively express, promote, pursue, or defend' any public or community interests." *Id.*

As reflected in the pleadings and evidence before us, Newpark's association (internally and externally) to express, promote, and pursue a common interest, namely, to form a competing business, is not a public or community interest; it is a private interest that benefits only the private parties involved in the intended business venture. *See id.* Similarly, based on the evidence and pleadings before us,

17

"investigating Cahoon's billing practices and rooting out any fraud" is not a public or community interest because it is based on Cahoon's invoicing of Newpark for services provided pursuant to the MSA and Newpark's investigation and audit of Cahoon's records pursuant to that agreement. The allegations in its case reflect that Newpark's audit and investigation was based, at least in part, on the fact that Newpark had been overbilling its customers and it planned to blame Cahoon for the "over-billing and thereby conceal its breaches of its contracts with these customers." It is a private contract dispute between two private parties and the only party who would benefit from this investigation is Newpark, and possibly the customers Newpark had overbilled. Furthermore, there is no indication in the record that the formation of Newpark's competing mat-instillation business or the investigation of Cahoon's billing practices with respect to the MSA involved any manner of public or citizen participation. Therefore, we hold that Newpark did not meet its burden of showing, by a preponderance of the evidence, that Cahoon's suit was based on, relates to, or is in response to an exercise of Newpark's right of association. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b).

## 2. Right of Free Speech

The TCPA defines the "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). A "communication" includes "the making or

18

submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). When this suit was filed, a "matter of public concern" included "an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7)[8]; *Coleman*, 512 S.W.3d at 899. Newpark argues that all of Cahoon's claims are "based on, relate[] to, or [are] in response to" one or more communications that Newpark made in connection with two matters of public concern: "economic, or community well-being" and "a good, product, or service in the marketplace." *Id.* § 27.001(7)(B), (E).

The Texas Supreme Court recently explained in *Creative Oil & Gas* that "not every communication related somehow to one of the broad categories set out in section 27.001(7) always regards a matter of public concern." *Creative Oil & Gas*, 591 S.W.3d at 137. In that case, the lessor of an oil and gas lease sued the lessee in a trespass and trespass to try title action, seeking a ruling that the lease was

---

[8]  The current version of the TCPA, which became effective on September 1, 2019, defines a "matter of public concern" as "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." TEX. CIV. PRAC. & REM. § 27.001(7). Notably, "environmental, economic, or community well-being" and "a good, product, or service in the marketplace" are no longer defined as a "matter of public concern." *See* TEX. CIV. PRAC. & REM. § 27.001(7) (current version).

terminated due to cessation of production. *Id.* at 130. As relevant here, the lessee and the operator filed counterclaims alleging that the lessor had breached the lease and had falsely told third-party purchasers of production from the lease that the lease was expired and that payments on the purchases should stop. *Id.* The lessor moved to dismiss the counterclaims pursuant to the TCPA and argued that its statements to third parties about the lease were an exercise of its right of free speech because these communications were made in connection with matters of public concern, namely, economic well-being and a good, product, or service in the marketplace.

The supreme court, however, rejected these arguments, and held that the lessor's communications with third parties were not covered by the TCPA because they were private business communications regarding a private contract dispute. *Id.* at 134–37. As the court explained, the terms "economic well-being" and "a good, product, or service in the marketplace" had to be interpreted considering the common meaning of a "matter of public concern," which does not include "purely private matters." *Id.* at 135. Therefore, the court reasoned, a communication regarding "a good, product, or service in the marketplace" does not constitute a matter of public concern unless the communication has "some relevance to a public audience of potential buyers or sellers." *Id.*; *see also id.* at 136 (stating that there was no indication in record "that the dispute had any relevance to the broader marketplace or otherwise could reasonably be characterized as involving public

20

concerns"). The court also rejected the argument that the communications at issue concerned a matter of public concern, namely, economic well-being, because "[a] private contract dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words." *Id.* at 137.

Relying in part on *Creative Oil & Gas*, this court held in *Gaskamp* that communications between former employees that related to the employees' alleged conduct of misappropriating, sharing, and using the plaintiff's trade secrets and conspiring with one another in furtherance of their tortious actions did not constitute an exercise of their free-speech rights because these communications "had no potential impact on the wider community or a public audience of potential buyers or sellers. In short, the communications had no public relevance beyond the pecuniary interests of the private parties." *Gaskamp*, 2020 WL 826729, at *13; *see also Creative Oil & Gas*, 591 S.W.3d at 137 (explaining that private "dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words"). This court also held that communications made by the plaintiff's former employees in soliciting and procuring business from a third party also did not constitute an exercise of the employees' free-speech rights because these communications did not have any "relevance to a public audience of buyers or sellers but instead were limited to 'the

21

pecuniary interests of the private parties involved." *Gaskamp*, 2020 WL 826729, at *15 (quoting *Creative Oil & Gas*, 591 S.W.3d at 136).

Newpark contends that its "invocation of its contractual audit rights to investigate Cahoon's fraudulent billing practices involved a 'matter of public concern' insofar as it involved: the (1) 'economic, or community well-being,' which is promoted and preserved by the ferreting out of fraud in the marketplace and community, and (2) 'a good, product, or service in the marketplace,' namely, Cahoon's mat-installation services." TEX. CIV. PRAC. & REM. CODE § 27.001(7)(B), (E). Therefore, Newpark reasons, the TCPA applies to Cahoon's lawsuit because its claims are "based on, relate[] to, or [are] in response to" "communications made by Newpark 'in connection with' its investigation and audit."

Every communication made in connection with economic or community well-being, or a good, product, or service in the marketplace, however, does not necessarily implicate a party's right to free speech because not every communication regards a matter of public concern. *See generally Creative Oil & Gas*, 591 S.W.3d at 137 ("[N]ot every communication related somehow to one of the broad categories set out in section 27.001(7) always regards a matter of public concern."). As explained in *Creative Oil & Gas*, "The phrase 'matter of public concern' commonly refers to matters 'of political, social, or other concern to the community,' as opposed to purely private matters." *Id.* at 135 (citing *Brady v. Klentzman*, 515 S.W.3d 878,

22

884 (Tex. 2017)). Thus, the communication must have some relevance to a broader public audience, as opposed to only the private parties involved. *See Creative Oil & Gas*, 591 S.W.3d at 137 ("A private contract dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words."). The communications at issue here, as Newpark acknowledges, are related to Cahoon's alleged fraudulent billing of Newpark for services Cahoon had provided to Newpark pursuant to the MSA and Newpark's audit and investigation into these specific practices, which Newpark contends are authorized by the MSA. Thus, whether Newpark was communicating internally or with Cahoon or its employees regarding the accuracy of Cahoon's invoices or matters associated with the investigation and audit, these communications concerned a private business dispute between Cahoon and Newpark. Newpark's communications with its customers regarding these billing practices are also directly related to and concern Newpark's contractual relationship with respect to Cahoon, and to a lesser extent, Newpark's contractual relationships with those customers. Similarly, the settlement agreement and Newpark's communications with Universal regarding that agreement are related to the billing dispute between Newpark and Cahoon, including the payment of invoices submitted pursuant to the MSA. As in *Creative Oil & Gas*, there is no indication in the record that the dispute between Newpark and Cahoon "had any relevance to the broader

23

marketplace or otherwise could reasonably be characterized as involving public concerns." *Creative Oil & Gas*, 591 S.W.3d at 136. The only parties with an interest in the outcome were Newpark, Cahoon, Universal (as a result of the settlement agreement) and possibly the customers that Newpark had overbilled. *See generally id.* at 136–37.

Because the communications at issue do not implicate a matter of public concern, we hold that Newpark did not meet its burden of showing, by a preponderance of the evidence, that Cahoon's suit was based on, related to, or was in response to an exercise of Newpark's right of free speech. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b).

## Conclusion[9]

We affirm the trial court's order.

Russell Lloyd
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

---

[9] Because we are affirming the trial court's order denying Newpark's TCPA motion to dismiss, we do not need to reach Cahoon's conditional cross-points. The only issue addressed in this opinion in whether Newpark is entitled to the dismissal of Cahoon's claims under the TCPA. The merits of Cahoon's claims are for further consideration in the trial court.